**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

**United States of America,**

       **Plaintiff,**

    **vs.**                       **No. 04-20006-01-02-JWL**

**Alverez McCullough and
Jami Mosley,**

       **Defendants.**

**MEMORANDUM & ORDER**

A jury convicted defendants Alverez McCullough and Jami Mosley of various drug trafficking crimes. The matter is before the court on defendants' amended motions for new trial based on new evidence purporting to establish that the cooperating witnesses at trial conspired to provide false testimony against Mr. McCullough and Ms. Mosley. The court held an evidentiary hearing on the motions beginning May 11, 2005 and concluding on May 13, 2005. After careful consideration of the evidence, the court concludes that no such conspiracy existed and, thus, denies defendants' motions.

**I.      Factual Background**

Defendant Jami Mosley owns a home located at 3244 Cleveland in Kansas City, Kansas. Ms. Mosley and defendant Alverez McCullough have had an ongoing, intimate relationship for years and they have three children together. Although Mr. McCullough owns a home elsewhere

in Kansas City, Kansas, he frequently stayed with Ms. Mosley and their children at the 3244 Cleveland residence.

On June 9, 2003, Officers Sandra Carrera and George Simms of the Kansas City, Kansas police department were dispatched to Ms. Mosley's home to investigate a security alarm that had been activated. Neither Ms. Mosley nor Mr. McCullough were present at the residence at the time. Officer Carrera arrived at the scene first and, upon her arrival at the residence, she observed a white male (later identified as Richard Cook) walking out of the basement's sliding glass door and a white female (later identified as Heather Gordon) standing next to him. Ms. Gordon approached Officer Carrera as Officer Carrera was exiting her vehicle and she advised Officer Carrera that the alarm had been an accident. Officer Carrera asked the two individuals if they were the homeowners. Ms. Gordon said that they were not the homeowners, but were there building a privacy fence for the owner and had permission from the homeowners to use the restroom facilities in the basement of the home.

Ultimately, Officer Carrera entered the residence to verify Ms. Gordon's statement that the homeowner had given them permission to use the restroom facilities in the basement of the home. She entered the basement through the sliding glass door (the same door she observed Mr. Cook exiting upon her arrival) to verify whether or not there was a bathroom in the basement and to see if there was evidence of a break in. Upon entering the basement area and making a left turn, Officer Carrera immediately observed a clear plastic bag containing what she believed to be a brick of marijuana located on top of a counter in plain view. As Officer Carrera turned around to exit the residence, she observed an open trash bag that

2

contained a larger quantity of what she believed to be bricks of marijuana.   Officer Carrera

exited the residence and informed Officer Simms of her discovery.   The officers detained Ms.

Gordon and Mr. Cook, contacted a supervising officer, and secured the residence.   Law

enforcement officials obtained a warrant to search the residence and seized several guns, crack

cocaine, powder cocaine, and marijuana from the residence.

The government charged both defendants with various drug trafficking crimes and

charged Mr. McCullough with possessing a firearm in furtherance of a drug trafficking crime.

Mr. McCullough and Ms. Mosley were tried together in October 2004.   A mistrial was

declared after the jury failed to reach a unanimous verdict on any counts as to either defendant.

The case was tried again in November 2004.   During that trial, the government presented

testimony from five cooperating witnesses–Edward Carvin, Marlon Hayes, Arnold Moore,

Corey Williams and Dominic Hayes.   Because defendants assert that the testimony of these

cooperators was false, the court has scrutinized carefully that testimony and, for this reason,

the court will summarize the second-trial testimony of the cooperators in some detail.

Edwin Carvin testified that he accompanied Arnold Moore, Mr. Carvin's main supplier,

to the 3244 Cleveland address on two occasions to purchase cocaine from Mr. McCullough.

According to Mr. Carvin, he accompanied Mr. Moore inside the residence on the first

occasion and, at that time, he saw a pregnant African-American female in the house and heard

her attending to small children.[1]   Mr. Carvin testified that he witnessed Mr. Moore purchase

---

[1]Other testimony at trial demonstrated that Ms. Mosley was pregnant during the relevant
time frame and that she and Mr. McCullough had several small children who lived at the 3244

3

cocaine from Mr. McCullough on this occasion.    On the second occasion, approximately one month later, Mr. Carvin, according to his testimony, was riding in the car with Mr. Moore when Mr. Moore called Mr. McCullough to inquire about purchasing additional powder cocaine. Mr. Carvin gave money to Mr. Moore and then waited in the car outside the 3244 Cleveland residence while Mr. Moore went inside the residence to purchase the drugs.    According to Mr. Carvin, Mr. Moore returned to the car with a kilogram of powder cocaine.

Marlon Hayes testified that, on one occasion, he and Corey Williams accompanied Arnold Moore to Mr. McCullough's house to purchase cocaine.    According to Marlon Hayes, he and Mr. Williams waited in the car outside the 3244 Cleveland residence while Mr. Moore went inside the residence.    Mr. Moore returned to the car with approximately one-half kilogram of cocaine that he had purchased for Corey Williams.    Marlon Hayes testified that he did not know whether Mr. McCullough or Ms. Mosley were present at the time of the drug transaction and that he had never been inside the 3244 Cleveland residence.

The third cooperating witness who testified on behalf of the government was Arnold Moore.    Mr. Moore testified that he knew Alverez McCullough because Mr. McCullough was best friends with Mr. Moore's brother, but Mr. Moore he did not "hang out" with Mr. McCullough.    Mr. Moore also testified that he knew Ms. Mosley from high school.    Having heard from his cousin that the cousin had bought cocaine from Mr. McCullough, Mr. Moore approached Mr. McCullough at a gas station owed by Mr. McCullough's father and obtained

Cleveland address.

4

Mr. McCullough's cell phone number.  At some point thereafter, Mr. Moore telephoned Mr. McCullough and told him that he needed to purchase some cocaine.  Mr. Moore then met Mr. McCullough at the gas station, gave cash to Mr. McCullough and received cocaine from Mr. McCullough.  Mr. Moore testified that he engaged in two subsequent drug transactions with Mr. McCullough at the gas station and, thereafter, he purchased cocaine from Mr. McCullough at the 3244 Cleveland residence, going there as often as every day or every other day to purchase cocaine.

According to Mr. Moore, he encountered Ms. Mosley at the 3244 Cleveland residence on two occasions when Mr. Moore went there to purchase drugs though Ms. Mosley never participated in the transactions in any way.  According to Mr. Moore, Edward Carvin accompanied him to Mr. McCullough's house on "a few" occasions, but he could not recall whether it was more than two times.  He further testified that on one occasion, he and Marlon Hayes picked up Corey Williams because Corey Williams wanted to buy some cocaine and they all went to Mr. McCullough's house.  At that point, as Mr. Moore testified, he went inside the house to purchase the drugs for Mr. Williams while Mr. Hayes and Mr. Williams waited in the car.  According to Mr. Moore, he gave Mr. Williams' money to Mr. McCullough and Mr. McCullough provided him with cocaine.

Corey Williams testified that, on one occasion, he contacted Marlon Hayes to see whether Mr. Hayes could "turn him on" to someone who could "help him out" after Mr. Williams' main supplier of cocaine, Sammy Nichols, refused to deal with him anymore in light of a debt Mr. Williams owed to Mr. Nichols.  According to Mr. Williams, Mr. Hayes "turned

him on to Arnold Moore."   Mr. Williams testified that Marlon Hayes and Arnold Moore picked him up in Mr. Moore's car and they drove to the 3244 Cleveland residence.   At that time, Mr. Williams gave Mr. Moore a bag full of cash, Mr. Moore went into the residence and then returned with cocaine.   Mr. Williams further testified that he did not know whether Mr. McCullough or Ms. Mosley were present at the time of the transaction and that he had never been inside the 3244 residence.

The government's final cooperating witness, Dominic Hayes, testified that he knew Mr. McCullough through the drug business and that he started buying drugs from Mr. McCullough after he ran into Mr. McCullough at a local restaurant and Mr. McCullough told him to "holler" at him because he was "on."   According to Mr. Hayes, Mr. McCullough's statement indicated that he had drugs to sell.   At that time, Mr. Hayes programmed Mr. McCullough's cell phone number into his cell phone and, thereafter, Mr. Hayes called Mr. Mr. McCullough to set up a transaction.   Mr. Hayes testified that on the first occasion when he went to the 3244 Cleveland address to purchase drugs from Mr. McCullough, he was accompanied by only his younger cousin and Mr. Hayes went into the residence by himself.   According to Mr. Hayes, "little kids" and "a woman" were in the house during the transaction–a transaction in which Mr. Hayes paid Mr. McCullough $10,000 and received from Mr. McCullough one-half kilogram of cocaine.

About one week after the first transaction, Mr. Hayes returned to the 3244 Cleveland residence and purchased another one-half kilogram of cocaine from Mr. McCullough.   Mr. Hayes also testified that he purchased marijuana from Mr. McCullough on several occasions

and that on each of these occasions he went to Mr. McCullough's house by himself.  Mr. Hayes testified that he purchased cocaine and marijuana from Mr. McCullough at the 3244 Cleveland residence on more than 20 occasions and that he never took anyone else inside the residence with him.  On one of these occasions, according to Mr. Hayes, a child came into the kitchen where the cocaine transaction was taking place and a woman came in and removed the child from the kitchen.  Finally, Mr. Hayes testified that he felt safe purchasing drugs from Mr. McCullough at the 3244 Cleveland residence because he did not think that Mr. McCullough "would try nothing with his girl and kids there with me."

In addition to the testimony provided by the cooperating witnesses, the government put on evidence demonstrating that Mr. McCullough was residing in the 3244 Cleveland address at the time the search warranted was executed.  In that regard, Mr. McCullough's personal belongings were found throughout the residence and government witnesses placed Mr. McCullough at the residence the day that the search warrant was executed.  The government also put on additional evidence linking Mr. McCullough to the drugs that were discovered in the residence.  Marijuana and cocaine were found in a Nike shoe box that also contained sandwich baggies bearing Mr. McCullough's fingerprints and white powder residue, a broken glass beaker, and a digital scale covered with white powder residue.

In his case, Mr. McCullough presented the testimony of Richard Cook, one of the individuals who was present at the 3244 Cleveland residence when Officer Carrera responded to the security alarm.  Mr. Cook testified that the drugs found inside the 3244 Cleveland residence belonged to him, were stored there by him and that neither Ms. Mosley nor Mr.

McCullough had any knowledge of the drugs.   The evidence showed that Mr. Cook is a homeless person who uses crack cocaine on a daily basis.   He testified that he frequently does remodeling projects for various members of the McCullough family and that he is paid in cash for those projects (as he does not have any identification that would permit him to cash a check).   When Mr. Cook was working on one of Mr. McCullough's properties, Mr. McCullough permitted Mr. Cook to spend the night there.   Mr. Cook further testified that Mr. McCullough permitted Mr. Cook to drive one of his trucks; without that truck, Mr. Cook had no method of transportation.   The McCullough family was Mr. Cook's primary source of income.   Thus, the government demonstrated that Mr. Cook was beholden to Mr. McCullough and his family for money, shelter and transportation.   The government also suggested through its cross-examination of Mr. Cook that it was Mr. Cook who tripped the alarm at Ms. Mosley's house on June 9, 2003–an error that resulted in the discovery of the drugs and weapons.   In addition, Mr. Cook testified that he had throat cancer and could not afford medical treatment (indeed, Mr. Cook could not communicate orally at trial and he testified by writing answers to counsel's questions), but he denied the government's suggestion that he was taking the blame for the drugs in Ms. Mosley's home in order to go to prison to receive medical care.[2]

---

[2]Richard Cook did not testify live at the second trial.   Rather, the transcript of Mr. Cook's testimony from the first trial was read to the jury during Mr. McCullough's case.   After Mr. Cook testified in the first trial, but before the case was retried, the government indicted Mr. Cook for perjury.   When Mr. McCullough called Mr. Cook as a witness in the second trial, Mr. Cook invoked his Fifth Amendment right against self-incrimination and declined to testify. Mr. McCullough, then, presented Mr. Cook's testimony from the first trial pursuant to Federal Rule of Evidence 804(b)(1).   Several months after the second trial,   Mr. Cook entered a plea of guilty to the charge of perjury, although he has subsequently filed a motion to withdraw his

Mr. McCullough did not testify at trial.  Ms. Mosley testified and denied any knowledge of the drugs or guns that were found in her home on June 9, 2003 and denied any knowledge of any drug trafficking activity taking place in the residence.  Ultimately, the jury convicted both defendants of conspiring to distribute or possess with intent to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine and/or 50 grams or more of a mixture or substance containing a detectable amount of cocaine base as charged in Count 1 of the Second Superseding Indictment.  Additionally, the jury found Mr. McCullough guilty of possessing with intent to distribute five hundred (500) grams or more of cocaine, possessing with intent to distribute marijuana, and possessing a firearm in furtherance of a drug trafficking crime as charged in Counts 3, 4 and 5, respectively.  The jury found Ms. Mosley guilty of managing and controlling as an owner a residence for the storage and distribution of a controlled substance as charged in Count 6 of the Second Superseding Indictment.

## II.      Procedural Background

Both defendants filed motions for judgment of acquittal or, in the alternative, for new trial.  These motions, in large part, challenged the sufficiency of the evidence at trial.  In February 2005, the court denied Ms. Mosley's motion in its entirety and denied Mr. McCullough's motion in large part.  The court granted Mr. McCullough's motion with respect

---

plea.

to the jury's finding that Mr. McCullough possessed a Ruger .45 caliber handgun in furtherance of a drug trafficking crime.  Sentencing was scheduled for April 25, 2005.

On March 18, 2005, the court received a letter from Mr. McCullough in which Mr. McCullough stated that he had "discovered from inmates" at Corrections Corporation of America (CCA), where Mr. McCullough was being held pending sentencing, that the cooperating witnesses who testified on behalf of the government and against Mr. McCullough and Ms. Mosley–Edwin Carvin, Marlon Hayes, Arnold Moore, Corey Williams and Dominic Hayes–had provided false testimony at trial.  In support of his assertion, Mr. McCullough attached to his letter written statements from nine inmates: Imon Wright, Robert Owens, Detreck Goles, Shavar Walker, Wendell Pearson, Chris Moore, Lamar Morgan, Carlos Brandon and Jeffrey Perry.  In summary, the statements of these inmates, taken together, suggested that the inmates had overheard the five cooperating witnesses conspiring to provide false testimony at trial in order to receive downward departures; that the inmates had been offered the opportunity to "buy" information concerning Mr. McCullough's case to enable the inmate to testify at trial and thereby receive a downward departure; and that some of the government's cooperating witnesses were "selling" information about Mr. McCullough's case so that other inmates could "jump on" the case and receive a downward departure.[3]

---

[3]The written statements provided by various inmates were neither presented in affidavit form nor sworn under penalty of perjury.  Moreover, none of the written statements were admitted into evidence at the hearing.  For these reasons, the court does not consider the contents of the written statements in resolving the defendants' motions for new trial.

After receiving Mr. McCullough's letter and the accompanying statements, the court, on March 25, 2005, held a status conference with counsel for all parties. At that time, the court indicated that it would not take any action with respect to Mr. McCullough's letter as Mr. McCullough was represented by counsel but had contacted the court directly. Counsel for defendants indicated that they would investigate the matter and, if appropriate, would file amended or renewed motions for new trial on or before April 5, 2005. Thereafter, counsel for defendants interviewed the majority of the inmates who had provided statements to Mr. McCullough and, based on the information obtained during those interviews, filed their amended motions for new trial. Upon receipt of the motions, the court continued sentencing until June 27, 2005 and scheduled an evidentiary hearing beginning May 11, 2005.

The hearing began on May 11, 2005 and concluded on May 13, 2005. During the course of the hearing, defendants called as witnesses six of the inmates who had previously provided written statements to Mr. McCullough–Robert Owens, Jeffrey Perry, Imon Wright, Wendell Pearson, Lamar Morgan and Shavar Walker–as well as one witness, Donald Hayes, who had not previously provided a written statement. The government called as witnesses, *inter alia*, each of the cooperating witnesses who had testified at trial and whose testimony was called into question by defendants.

Additional detail will be provided in connection with the court's analysis of the motions for new trial.

**III.     Applicable Legal Standard**

11

All parties agree on the standard applicable to defendants' motions. Defendants' motions for new trial are based on newly discovered evidence and a five-part test is applied in determining whether such evidence warrants a new trial. Defendants must show that (1) the evidence was discovered after trial, (2) the failure to learn of the evidence was not caused by his or her own lack of diligence, (3) the new evidence is not merely impeaching, (4) the new evidence is material to the principal issues involved, and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal. *See United States v. Higgins*, 282 F.3d 1261, 1278 (10th Cir. 2002). The government maintains that defendants cannot meet this standard because the evidence presented at the hearing is merely impeaching and would not "probably produce an acquittal." As explained below, the court disagrees and concludes that the evidence presented by defendants is not merely impeaching and that the evidence, if believed, would probably produce an acquittal.

In this case, the testimony of the cooperating witnesses was significant–indeed, it was critical to obtaining convictions in the case. Aside from the testimony of the cooperating witnesses, the government's evidence against the defendants, in large part, was circumstantial. In that regard, the government presented evidence that Mr. McCullough was residing at 3244 Cleveland at the time large quantities of cocaine, marijuana, weapons and U.S. currency were discovered at the residence. Mr. McCullough's personal belongings, for example, were found throughout the residence and Heather Gordon (Richard Cook's long-time girlfriend and the other individual who was present at the 3244 Cleveland residence at the time Officer Carrera responded to the security alarm on June 9, 2003) placed Mr. McCullough at the residence the

12

day that the search warrant was executed.   While Mr. McCullough's fingerprints were found

on bags located inside a "cocaine base cooking kit" discovered at the residence, it was the

testimony of the cooperating witnesses that demonstrated that Mr. McCullough was selling

drugs out of the residence, thus enabling the jury to conclude that the drugs and weapons found

in the house on June 9, 2002 belonged to Mr. McCullough as opposed to some other

individual, such as Richard Cook.   In fact, in upholding Mr. McCullough's conspiracy

conviction in connection with Mr. McCullough's initial motion for new trial, the court relied

in large part on the testimony of the cooperating witnesses.

        The court also relied heavily on the testimony of the cooperating witnesses in upholding

Mr. McCullough's convictions for possessing with intent to distribute cocaine and marijuana

in violation of 21 U.S.C. § 841(a)(1).   In concluding that Mr. McCullough constructively

possessed the cocaine and marijuana that were discovered in Ms. Mosley's home, the court

cited the "overwhelming evidence" that Mr. McCullough, based on the testimony of the

cooperating witnesses, had sold drugs from Mr. Mosley's home.   As the court explained in its

earlier order upholding the convictions, the evidence of Mr. McCullough's drug sales–again,

evidence provided solely by the cooperating witnesses–was critical in linking Mr. McCullough

to the marijuana and cocaine found in the house.

        The testimony of the cooperating witnesses was even more critical to the government's

ability to obtain a conviction as to Ms. Mosley.   In upholding the conspiracy conviction as to

Ms. Mosley, the court relied in large part on the testimony of Edwin Carvin, one of the

cooperating witnesses, for its conclusion that the evidence at trial was sufficient to

demonstrate that Ms. Mosley knew that Mr. McCullough was using her home to conduct drug transactions. Edwin Carvin testified that on one occasion when he was at the 3244 Cleveland residence purchasing a kilogram of cocaine from Mr. McCullough he saw a pregnant African-American female in the house and heard her attending to small children. As the court concluded in its earlier order upholding Ms. Mosley's conspiracy conviction, it was entirely reasonable for the jury to infer that this woman was Ms. Mosley, as other testimony at trial demonstrated that Ms. Mosley was pregnant during the relevant time frame and that she and Mr. McCullough had several small children who lived at the 3244 Cleveland address. Moreover, based on Mr. Carvin's testimony that the individuals participating in the drug transaction were cooking cocaine into cocaine base in Ms. Mosley's kitchen–a process that produces a distinct odor and that was occurring in close enough proximity to Ms. Mosley that Mr. Carvin saw her pass through a hallway–the court determined that a reasonable jury could conclude that Ms. Mosley knew that the individuals were in her kitchen conducting a drug transaction.

In addition to the specific testimony provided by Mr. Carvin, the court also relied on the testimony of the other cooperating witnesses in upholding Ms. Mosley's conspiracy conviction. In that regard, the court highlighted the sheer number of drug transactions taking place at the 3244 Cleveland residence–evidence provided only by the cooperating witnesses–as another reasonable basis for the jury to conclude that Ms. Mosley knew that Mr. McCullough was using her home to conduct drug transactions.

As should be apparent, then, the testimony of the cooperating witnesses was critical to the government's ability to obtain convictions in this case. This is particularly true in light of

14

the fact that another witness, Richard Cook, testified that the drugs discovered in the 3244 Cleveland residence belonged to him and that neither Mr. McCullough nor Ms. Mosley had any knowledge of the drugs.   While the jury in the second trial obviously did not believe Mr. Cook's testimony, Mr. Cook's testimony marked the first time in more than 13 years that this judge has been on the bench that another individual has testified in a criminal case and accepted responsibility for the crime charged against the defendant.   Moreover, the first trial of defendants' case resulted in a mistrial after the jury hung on all counts as to both defendants. The government's case against defendants, then, was certainly not a "slam dunk."

Thus, the testimony provided by defendants' witnesses at the hearing, if believed, would do more than simply undermine the testimony of the cooperating witnesses; it would dismantle the heart of the government's case.   For as counsel for Ms. Mosley argued, if the cooperating witnesses, as suggested by defendants, entered into an agreement–a conspiracy–to obstruct justice for the sake of reducing their own sentences by willfully providing false testimony against Mr. McCullough and Ms. Mosley, then it would be an insult to society and the justice system itself to uphold their convictions in this case.   In short, if the court were to conclude that the cooperating witnesses had conspired to present false testimony against defendants, then the court would readily conclude that defendants would be entitled to a new trial.   And while the court believes it is entirely plausible for a conspiracy such as the one described by defendants' witnesses to exist, particularly in light of the opportunity for abuse when the government offers leniency in exchange for a codefendant's testimony, *see United States v. Singleton*, 144 F.3d 1343, 1350 (10th Cir. 1998) (the promise of a reduced sentence "imports

as great a threat to a witness's truthfulness as a cash payment"), *overruled by* 165 F.3d 1297 (10th Cir. 1999), the court concludes that no such conspiracy existed in this case.

## IV.    Merits of the Amended or Renewed Motions for New Trial

Defendants' amended or renewed motions for new trial are based on "new evidence" suggesting that the government's cooperating witnesses had conspired to provide false testimony at trial in order to receive downward departures; that certain inmates at CCA had been offered the opportunity to "buy" information concerning Mr. McCullough's case to enable the inmates to testify at trial and thereby receive a downward departure; and that some of the government's cooperating witnesses were "selling" information about Mr. McCullough's case so that other inmates could "jump on" the case and receive a downward departure.[4]

As explained below, the court denies defendants' motions. For a variety of reasons, the court, in large part, does not believe the testimony provided by defendants' witnesses. In some instances, the substance of the testimony provided by defendants' witnesses simply defies all

---

[4]The government lodged a continuing objection to that portion of the testimony provided by defendants' witnesses in which the witnesses related conversations that they overheard between the cooperating witnesses and conversations that they participated in with cooperating witnesses. In essence, the government objected to defendants' witnesses testifying about statements made by cooperating witnesses concerning the cooperating witnesses' efforts to "jump on" Mr. McCullough's case, the selling of information concerning Mr. McCullough's case, and whether they actually "knew" Mr. McCullough. The court took these objections under advisement and, ultimately, the court declines to rule on these objections as it has considered the testimony of defendants' witnesses in its entirety and nonetheless rules in favor of the government on the merits of defendants' motions.

16

common sense and, thus, lacks credibility. Other testimony contradicted certain extrinsic evidence and, for that reason, the testimony is not credible. In other instances, defendants' witnesses contradicted each other on key facts, rendering the testimony untrustworthy. While portions of the testimony provided by defendants' witnesses is credible (*i.e.*, testimony concerning whether the cooperating witnesses "knew" Mr. McCullough), that testimony in no way suggests that the cooperating witnesses provided false testimony at trial. Finally, the court, based on the totality of the evidence presented at the hearing, concludes that if any conspiracy to present false testimony existed, then it was initiated at the direction of Mr. McCullough and was carried out at the evidentiary hearing before this court.

*Certain Testimony Defies Common Sense*

Defendants' motions for new trial are premised on the notion that the government's cooperating witnesses approached numerous inmates at CCA (often inmates the cooperating witnesses did not even know) and advised those inmates that they were going to testify against Mr. McCullough. Jeffrey Perry, for example, testified that Dominic Hayes announced to a group of inmates during outside rec that he had testified against Mr. McCullough. Donald Hayes testified that Corey Williams, someone whom Mr. Hayes did not know aside from sharing the same pod with Mr. Williams in CCA, approached him and "confided" in him that he had testified against Mr. McCullough. Imon Wright testified that he was sitting in church when Arnold Moore asked him if he wanted a downward departure and advised him that he could testify against Mr. McCullough. Shavar Walker testified that Dominic Hayes told him

"and a couple other people" that he had testified against Mr. McCullough and that he had sold information about Mr. McCullough's case to an inmate known as "Big Kev." According to Mr. Walker, he is not friends with Dominic Hayes and Mr. Hayes simply confided in him out of the blue on that one occasion.

The court does not believe that any of the cooperating witnesses would have announced to other inmates that they had testified or intended to testify against Mr. McCullough. In fact, as Robert Owens, defendants' own witness, explained: "Nobody is going to walk around and say to everybody I testified on this person because other people [are] listening to their conversation." Another one of defendants' witnesses, Donald Hayes, testified that "snitches" do not want other inmates at CCA to know that they testified against someone and that "snitches [are] viewed badly all over the world." Arnold Moore confirmed that inmates at CCA who have cooperated with the government keep that information to themselves and do not share that information with other inmates.

As recognized by these witnesses, it is highly unlikely that a cooperating witness would willingly identify himself as such to any other inmate at CCA. The rationale is simple enough. "Snitches" are routinely assaulted in prison based solely on the fact that they have cooperated with the government. As Edward Carvin testified at the hearing, he did not want anyone at CCA to know that he was cooperating with the government because it would "start a lot of fights with people." The Tenth Circuit has inherently recognized that an inmate who has been labelled a "snitch" is placed at risk of assault. *See, e.g.*, *Benefield v. McDowall*, 241 F.3d 1267, 1271 (10th Cir. 2001) (affirming denial of qualified immunity when evidence demonstrated that

prison official had circulated rumors that plaintiff was a snitch); *Northington v. Marin*, 102 F.3d 1564, 1567 (10th Cir. 1996) (affirming judgment in favor of prisoner against guard who spread rumor that he was a snitch that resulted in assaults by other prisoners; defendant guard testified that if he spread the rumor, the prisoner would probably be beaten).  Moreover, the Judiciary itself recognizes the potential dangers faced by a cooperating witness in prison and has made efforts to keep confidential the fact that a witness has cooperated with the government–motions for downward departures pursuant to USSG § 5K1.1 are routinely filed under seal and neither presentence investigation reports nor statements of reasons are kept in the public file.  It defies common sense, then, to think that the cooperating witnesses in this case would have disclosed to numerous random inmates that they had cooperated with the government in Mr. McCullough's case.

Other evidence presented by defendants also lacks credibility because it defies common sense.  In that regard, Wendell Pearson testified that he overheard the five cooperating witnesses "getting their stories straight" in the holding cell of the U.S. Marshal's office on October 22, 2004 when the cooperating witnesses were brought to the courthouse to provide testimony during the first trial.  To believe Mr. Pearson's testimony, however, is to believe that the government permitted its five cooperating witnesses to arrive at the courthouse on the day that the witnesses were scheduled to testify without preparing those witnesses or assuring itself that the witnesses were able to provide detailed, credible testimony concerning their interactions with Mr. McCullough.  The court simply does not believe the government would have put itself in that position.  As Agent Shawn Buck testified, each of the cooperating

witnesses had provided a detailed proffer of their proposed testimony, had been prepared for trial long before they arrived at the courthouse on October 22, 2004 and testified consistently with their proffers.[5]

*Certain Testimony Contradicts Extrinsic Evidence*

Much of the evidence presented by defendants' witnesses is entirely inconsistent with certain undisputed facts and, for that reason, is not credible.  Imon Wright, for example, testified that he had a conversation with Arnold Moore during a church service at CCA in which Mr. Moore told him that if he wanted a downward departure he simply had to "get up on the stand" and testify that he rode with Mr. Moore to Mr. McCullough's house to buy drugs.  Mr. Wright further testified that Mr. Moore offered to call the prosecutor and "get a downward" for Mr. Wright if Mr. Wright agreed to testify against Mr. McCullough. However, it is undisputed that Mr. Wright was not arrested until January 7, 2005 and that he did not arrive at CCA until that time.  Of course, by January 2005, the trial in this case had long since concluded.  It is simply not credible, then, that the conversation described by Mr. Wright actually occurred.  Mr. Wright also testified that he had conversations with Dominic Hayes at

_____

[5]As explained in parts of this opinion, the court discredits much of Mr. Pearson's testimony.  However, the court does not necessarily believe that Mr. Pearson willfully intended to deceive the court with respect to the subjects to which he testified.  Rather, the court believes that Mr. Pearson, like Richard Cook, is an individual who is easily manipulable by others (in this case, by Mr. McCullough).  Mr. Pearson's vulnerability in this regard may be due to the fact that Mr. Pearson's intelligence level is below normal, an issue that was referenced at the hearing and noted in Mr. Pearson's presentence investigation report.

CCA in which Mr. Hayes advised him that he was "going to testify" against Mr. McCullough. Again, the trial had concluded more than a month before Mr. Wright even arrived at CCA and, thus, Mr. Hayes had already testified by the time Mr. Wright arrived at CCA.   It is not believable, then, that Mr. Hayes and Mr. Wright had a conversation at CCA in which Mr. Hayes discussed his intent to testify.

Wendell Pearson testified that he overheard Dominic Hayes, Marlon Hayes, Arnold Moore, Corey Williams and Edward Carvin "getting their stories straight" while he and the cooperating witnesses were all being held together in the U.S. Marshal's office on two separate occasions.   The first occasion was October 22, 2004–the day that Mr. Pearson was indicted and, coincidentally, the same day that the five cooperating witnesses were at the courthouse to testify in Mr. McCullough's first trial.   Mr. Pearson further testified that he returned to the courthouse from CCA on October 27, 2004 and that each of the five cooperating witnesses returned to the courthouse with him on that day.   However, records from the U.S. Marshall's office revealed that neither Marlon Hayes nor Edward Carvin had been transported to the courthouse from CCA on October 27, 2005.   At best, this fact casts significant doubt on the accuracy of Mr. Pearson's memory; at worst, it casts doubt on the truthfulness of Mr. Pearson's testimony.

*Defendants' Witnesses Contradict Each Other*

In addition, portions of the testimony provided by some of defendants' witnesses at the evidentiary hearing was inconsistent with the testimony of other witnesses called by defendants

and, for this reason, the testimony is not credible.  Mr. Pearson, for example, testified that in the conversations he overheard in the holding cell in the U.S. Marshal's office, Arnold Moore did the vast majority of the talking and he was advising the other cooperating witnesses about what they should say on the stand.  In contrast, Mr. Morgan testified that Dominic Hayes did most of the talking in the holding cell and Mr. Hayes was telling the other witnesses what to say on the stand.[6]  Mr. Pearson testified that on October 22, 2004, he was held in the same cell as Arnold Moore and Dominic Hayes and that Marlon Hayes, Corey Williams and Edward Carvin were held in an adjoining cell along with Lamar Morgan.   Mr. Morgan, however, testified that he and Arnold Moore were held together in a cell and that Dominic Hayes, Marlon Hayes, Corey Williams and Edward Carvin were all together in another cell.   In all likelihood, neither Mr. Pearson nor Mr. Morgan is correct as Corey Williams was a separatee of both Dominic and Marlon Hayes.   Thus, as both Mr. Williams and Roland Hoffer, a U.S. Marshal, testified at the hearing, Mr. Williams would not have been placed in a holding cell with either of the Hayes brothers.   Mr. Pearson also testified that Lamar Morgan returned to the courthouse with him and the five cooperating witnesses on October 27, 2004.   Mr. Morgan, however, had no memory of being at the U.S. Marshall's office on October 27, 2005.   He only recalled being held with Mr. Pearson and the cooperating witnesses on one occasion.

---

[6]According to Mr. Morgan, Dominic Hayes was saying, verbatim, "You should do this and you should do that and you should be able to get a time cut."  As Mr. Morgan conceded, he did not "catch" everything that was being said in the holding cell because the cooperating witnesses were speaking in whispers and Mr. Morgan was only "ear hustlin,'" which in context clearly meant that he was eavesdropping.

Moreover, Shavar Walker testified that he had a conversation with Dominic Hayes on the basketball court at CCA during outside recreation and that, during this conversation, Mr. Hayes told him that he had "jumped on" Mr. McCullough's case to get a downward departure, that he had received information about Mr. McCullough's case from Sammy Nichols, and that Mr. Hayes, in turn, had sold information about Mr. McCullough's case to another inmate known as "Big Kev." According to Shavar Walker, Jeffrey Perry was present during this specific conversation. Jeffrey Perry's recollection, however, was quite different. Mr. Perry testified that he had only one conversation with Dominic Hayes about Mr. McCullough's case and the conversation took place as they were coming inside from outside recreation and were in a hallway passing by the inmates participating in inside recreation. According to Mr. Perry, Mr. Hayes saw Mr. McCullough in inside recreation and said, "Oh, shit. That's the dude I told on." Mr. Perry testified that Mr. Hayes then said that a "guy named Arnold" gave him Mr. McCullough's name so that Mr. Hayes could get a downward departure. According to Mr. Perry, the only thing that Mr. Hayes said about an inmate named "Kevin" was that he was going to "tell on" Kevin, too, but that Kevin ended up pleading guilty. Finally, Mr. Perry testified that Mr. Hayes told another inmate in the conversation, Jason, that he could jump on Mr. McCullough's case, too. According to Mr. Perry, however, this conversation took place in December 2004 or January 2005–after the trial had concluded.

Other testimony provided by defendants' witnesses is not credible in light of the actual testimony that was presented by the cooperating witnesses at trial. Wendell Pearson, for example, testified that in the conversation that he overheard in the U.S. Marshal's holding cell

Dominic Hayes was asking Arnold Moore whether he should say that he was in the front seat or the back seat and was asking Mr. Moore about what kind of car he should say they drove to Mr. McCullough's house. According to Mr. Pearson, the conversation between Mr. Hayes and Mr. Moore indicated that the two were planning to testify falsely that they had gone together to Mr. McCullough's house to buy drugs. At trial, however, neither Dominic Hayes nor Mr. Moore testified that they had ever been to Mr. McCullough's house with the other. In fact, Mr. Hayes testified that he always went to Mr. McCullough's house by himself, with the exception of one occasion when he took his younger cousin with him who waited outside. Thus, it simply makes no sense that Mr. Hayes was asking Mr. Moore in the holding cell whether he should say he rode in the front or back seat. It does not make sense that Mr. Hayes was attempting to verify what type of car he and Mr. Moore drove to Mr. McCullough's house. The court, then, does not find Mr. Pearson's testimony credible.

*Evidence that the Cooperating Witnesses Did Not "Know" Alverez McCullough*

The vast majority of the witnesses called by defendants at the evidentiary hearing testified that the cooperating witnesses, primarily Dominic Hayes and Corey Williams, did not know Mr. McCullough, suggesting that the testimony provided by Mr. Hayes and Mr. Williams concerning Mr. McCullough must have been false (the idea being that a witness cannot provide information about a defendant if the witness has no knowledge of that defendant). Robert Owens, for example, testified that he overheard Dominic Hayes say that he "didn't know" Alverez McCullough and was going to testify against him. Jeffrey Perry testified that when

24

Dominic Hayes told him and other inmates that he was going to testify against Mr. McCullough, another inmate asked Mr. Hayes how he could testify against someone that he knew from his hometown.  According to Mr. Perry, Mr. Hayes replied, "I don't know that dude for real."  Similarly, Imon Wright testified that Dominic Hayes told him that he was going to testify against Mr. McCullough and he "didn't know him that well."  Donald Hayes testified that Corey Williams told him that he did not know Mr. McCullough and had testified against him.  Lamar Morgan testified that Dominic Hayes told him that he did not "really" know Mr. McCullough and that Mr. Williams told him that he "didn't know [Mr. McCullough] either."

The testimony of defendants' witnesses, even if true, is in no way inconsistent with the trial testimony of Dominic Hayes and Corey Williams.    Mr. Williams did not testify at trial that he knew Mr. McCullough and he in no way attempted to suggest that he knew Mr. McCullough.  Mr. Williams did not testify at trial that he had any personal contact whatsoever with Mr. McCullough.  He simply testified that he accompanied Marlon Hayes and Arnold Moore to the 3244 Cleveland residence on one occasion and that he did not even go inside the residence on that occasion.  Thus, even assuming that Mr. Williams told inmates at CCA that he did not know Mr. McCullough and that he had testified against him, that statement would be entirely consistent, in Mr. Williams' case, with providing truthful testimony at trial.  Stated another way, the fact that Mr. Williams did not know Alverez McCullough in no way suggests that his trial testimony was false.

Similarly, the testimony provided at the evidentiary hearing concerning Dominic Hayes' knowledge of Mr. McCullough does not demonstrate that Mr. Hayes' trial testimony was false.

As an initial matter, the testimony provided by Jeffrey Perry, Imon Wright and Lamar Morgan does not even indicate that Mr. Hayes did not know Mr. McCullough. These witnesses testified only that Mr. Hayes did not "really" know Mr. McCullough or did not know Mr. McCullough "that well." Dominic Hayes' testimony at trial that he knew Mr. McCullough only through purchasing drugs from Mr. McCullough is entirely consistent with the testimony of Mssrs. Perry, Wright and Morgan.

Moreover, even assuming that Dominic Hayes told Robert Owens that he did not know Mr. McCullough, this statement would not be inconsistent with his testimony that he purchased drugs from Mr. McCullough. As evidenced by the testimony of several witnesses at the hearing, the concept of "knowing" an individual is not necessarily the same in the world of drug trafficking as it might be in other circles of society. For example, Donald Hayes testified that he did not know Corey Williams, although he acknowledged that he had met Mr. Williams on multiple occasions, was housed in the same pod as Mr. Williams at CCA and had had several conversations with Mr. Williams. Corey Williams, in turn, testified that he did not know Donald Hayes, but confirmed that he and Mr. Hayes were housed in the same pod at CCA and had conversed on several occasions. Mr. Williams also testified that he did not know Lamar Morgan, although he saw Mr. Morgan on a daily basis when they were housed together in the same pod at CCA. Similarly, when Imon Wright was asked how long he had known Arnold Moore, he responded: "I wouldn't say I knew him, but I just knew him from being around the city is all." The testimony from defendants' witnesses, then, demonstrates that even if Dominic Hayes said that he did not know Alverez McCullough, that statement is not

26

necessarily inconsistent with the fact that he purchased drugs from Mr. McCullough on a frequent basis.

For all of the foregoing reasons, the court finds the testimony of defendants' witnesses largely unworthy of credence and the court simply does not believe that the cooperating witnesses conspired to present false testimony at the trial of Mr. McCullough and Ms. Mosley. In addition to the specific reasons outlined above, the court also considers that the testimony provided by defendants' witnesses was in most instances vague and the witnesses were unable to recollect specific details about the conversations they were recounting.   In fact, details provided by several witnesses concerning conversations that they had had or had overheard varied from direct examination to cross-examination and again on redirect examination.   In contrast, the testimony of the cooperating witnesses at trial was very detailed and did not vary–leading the court to conclude that the information about which the cooperating witnesses testified could have been obtained only through personal knowledge as opposed to some third party.   Moreover, it is significant that none of defendants' witnesses testified that any of the cooperating witnesses actually stated that they intended to lie on the stand, that they had lied on the stand or that they otherwise had provided false testimony.

*A Conspiracy to Present False Testimony*

As explained above, the court does not believe that the cooperating witnesses engaged in a conspiracy to present false testimony at trial.   In fact, based on the totality of the evidence presented at the hearing, the court concludes that if any conspiracy to present false testimony

existed, then it was initiated at the direction of Mr. McCullough and was carried out at the evidentiary hearing before this court.   While the government attempted to show that Mr. McCullough provided consideration in the form of commissary[7] or the use of his phone cards in exchange for the testimony of his witnesses at the hearing, the evidence supporting the government's theory was inconclusive and the court does not find it persuasive that Mr. McCullough did, in fact, "pay" his witnesses for their testimony.   While the motive of these witnesses is not entirely clear, the court believes that defendants' witnesses agreed to provide written statements to Mr. McCullough and to testify at the hearing based on some personal loyalty to Mr. McCullough (the evidence at the hearing demonstrated that most, if not all, of defendants' witnesses were close associates of Mr. McCullough's), based on a strong dislike for those inmates that choose to cooperate with the government (the evidence at the hearing demonstrated that none of defendants' witnesses had cooperated with the government in any case and that none of the witnesses had received or attempted to receive a downward departure), or based on some combination of these two motivations.

The court's belief that Mr. McCullough conspired to present false testimony at the hearing is buttressed by certain evidence presented at the hearing.   Evidence was presented that David Tabor, another inmate at CCA, had  obtained written statements from several inmates (in the hopes of getting a new trial) suggesting that the cooperating witnesses in his case had

_____

[7]"Commissary," as several witnesses testified, refers to the prison's commissary, where an inmate can purchase food, athletic shoes, and other personal items and those purchases are then debited from the inmate's prison account.

perjured themselves.  According to Donald Hayes, Mr. Tabor "had people basically do the same thing" as Mr. McCullough did.  Edward Carvin testified that Mr. Tabor "got some people to write letters for him so he could get a retrial because he lost."  Mr. Carvin further testified that everyone at CCA knew about Mr. Tabor and his efforts to obtain a new trial and that he had heard about Mr. Tabor during or just after Mr. McCullough's trial.[8]  In all likelihood, then, Mr. McCullough heard about Mr. Tabor's efforts when he arrived at CCA and the court believes that Mr. McCullough, in his desire for an acquittal or a new trial, adopted the approach utilized by Mr. Tabor.  Unlike Mr. McCullough, Mr. Tabor ultimately abandoned his efforts.  *See United States v. Tabor*, 365 F. Supp. 2d 1052 (D. Neb. 2005).  As explained by the district judge in Mr. Tabor's case:

> Tabor filed a motion for new trial asserting that several of the cooperating witnesses perjured themselves when they testified against him at trial.  An evidentiary hearing was scheduled and 1.5 days were allotted to resolve the question of whether Tabor was unjustly convicted by perjury.  However, on the day of the evidentiary hearing, Tabor withdrew his motion for new trial.  In exchange, the government promised not to prosecute him or seek a sentencing enhancement based upon Tabor's assertions and conduct relating to the motion for new trial.

*See id.* at 1056.

---

[8]Counsel for defendants objected to Mr. Hayes' and Mr. Carvin's testimony regarding Mr. Tabor as hearsay and the court took the objection under advisement.  The court now overrules that objection as the government did not offer the statements concerning Mr. Tabor to prove that Mr. Tabor, in fact, obtained written statements from other inmates in the hopes of securing a new trial, but to show that Mr. McCullough, in all probability, heard the rumors about Mr. Tabor's efforts and adopted the same scheme.  *See* Fed. R. Evid. 801(c) (hearsay defined as a statement "offered in evidence to prove the truth of the matter asserted"); *Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1434 (10th Cir. 1993) ("Statements offered for the effect on the listener . . . are generally not hearsay.").

Other evidence presented at the hearing leads the court to believe that Mr. McCullough conspired to present false testimony in support of his motion for new trial. Calvin Cofield, an inmate at CCA, testified that he received a note from Mr. McCullough at CCA in which Mr. McCullough advised Mr. Cofield that he needed Mr. Cofield to write a statement saying that "those bitch ass niggas lied on me."[9] According to Mr. Cofield, Mr. McCullough also stated in the note, "You owe me this, bro." Mr. Cofield refused to write the statement because, according to Mr. Cofield, he had no knowledge of whether any of the cooperating witnesses had lied at trial. Mr. Cofield's cell mate, Robert Howell, corroborated Mr. Cofield's testimony and stated that Mr. Cofield had shown the note to Mr. Howell. Mr. Howell recalled that the note from Mr. McCullough stated, "I need you to make a statement saying that bitch ass nigga don't know me; you owe me, bro." This testimony strongly suggests to the court that Mr. McCullough was seeking written statements from inmates regardless of whether those inmates had any personal knowledge regarding the truthfulness of the cooperating witnesses' testimony at trial.

---

[9]Counsel for defendants objected to Mr. Cofield's testimony on this subject as hearsay. The court overruled the objection as to Mr. McCullough, ruling that the testimony was admissible under Rule 801(d)(2)(A), and retained the objection under advisement as to Ms. Mosley. The court now sustains the objection as to Ms. Mosley, as the contents of the note from Mr. McCullough were introduced to prove the truth of the statements made in the note (that Mr. McCullough asked Mr. Cofield to provide a written statement about the cooperating witnesses) and no exceptions would apply rendering the contents of the note admissible as to Ms. Mosley. Thus, the court does not consider Mr. Cofield's testimony on this subject as it relates to Ms. Mosley.

Another inmate, Carl Nelson, testified that he had passed notes for Mr. McCullough on several occasions at CCA and that, just one week before the evidentiary hearing, he read a note that he was passing from Mr. McCullough to another inmate named Carlos Brandon. According to Mr. Nelson, the note essentially advised Mr. Brandon to say that he (Mr. Brandon) was in Mr. McCullough's cell and that Arnold Moore knocked at the cell door and said that the prosecutor threatened harm to Mr. Moore's family if Mr. Moore did not testify against Mr. McCullough.   According to Mr. Nelson, the note then stated, "Make sure you remember to say that."   This testimony indicates that Mr. McCullough was providing to Mr. Brandon the substance of the statement he sought from Mr. Brandon.   Moreover, the "remember to say that" portion of the note reflects that the incident described by Mr. McCullough in the note did not actually occur, necessitating Mr. Brandon's memorization of the incident.

Finally, the record in this case suggests that Mr. McCullough has a history of obstructing justice by conspiring to present false testimony.   As noted earlier, Mr. McCullough called Richard Cook as a witness in both trials.   In the first trial, Mr. Cook accepted responsibility for the drugs found at the 3244 Cleveland residence and swore under oath that Mr. McCullough had no knowledge of the drugs.   Shortly thereafter, Mr. Cook was indicted for perjury and ultimately entered a plea of guilty to perjury.   In the plea agreement executed by Mr. Cook, he admits that he lied on the stand in an effort to take responsibility for the actions of Mr. McCullough and Ms. Mosley.

31

Having concluded that Mr. McCullough conspired to present false testimony in his efforts to obtain a new trial, the court puts Mr. McCullough on notice that it likely will take that conclusion into consideration in determining a reasonable sentence for Mr. McCullough. [10] As no evidence was presented suggesting that Ms. Mosley actively participated in the conspiracy described above, the court will not consider these facts in sentencing Ms. Mosley.

**IT IS THEREFORE ORDERED THAT** defendant Alverez McCullough's amended motion for new trial (doc. #148) is denied; defendant Jami Mosley's amended renewed motion for judgment of acquittal/motion for new trial (doc. #149) is denied; and defendant Jami Mosley's supplemental motion for new trial (doc. #185) is denied.

**IT IS SO ORDERED** this 3rd day of June, 2005.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

---

[10]The court does not suggest that counsel for Mr. McCullough knowingly participated in this conspiracy.  He was faced with the difficult situation of a client who had been convicted of serious offenses, facing a potentially long prison term, who presented him with statements from witnesses which, if considered in a light most favorable to Mr. McCullough, depicted a scenario that merited further investigation.  Upon that investigation, counsel found that the witnesses adhered to their stories.  He was, in the court's view, duty bound to present this evidence to the court, if his client so desired, for the court, rather than counsel, ultimately to judge its credibility.  Counsel for Ms. Mosley, similarly, played an appropriate role in these proceedings, advocating for his client's best interests without personally vouching for the reliability of the evidence.